**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 11 2012, 8:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN F. CRAWFORD**
Crawford & Devane
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GARY R. ROM**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOHN TOMPKINS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1111-CR-690 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Sheila A. Carlisle, Judge
The Honorable Stanley E. Kroh, Master Commissioner
Cause No. 49G03-1101-FA-431

**October 11, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

John Tompkins appeals his conviction for burglary as a class A felony and his status as an habitual offender. Tompkins raises three issues, which we revise and restate as follows:

I.      Whether the retrial of Tompkins constituted a double jeopardy violation;

II.     Whether the trial court abused its discretion in admitting certain testimony; and

III.    Whether the prosecutor committed prosecutorial misconduct that resulted in fundamental error.

We affirm.

The relevant facts follow. On December 27, 2010, Daphne Rutledge and Brittany Henderson went to Mary Orr's house to pick her up, and Tompkins, who was dating Orr, was at the house at the time. After picking up Orr, the three women went to Rutledge's home. Rutledge lived with her mother Dorothy and her nine-year-old daughter. At some point, Rutledge, Henderson, and Orr left to run errands and stopped at a gas station, where they saw Tompkins, who was wearing an all gray jogging or sweat suit, white t-shirt, and white tennis shoes and had braids in his hair. Instead of leaving the gas station with Rutledge and Henderson as planned, Orr left with Tompkins.

Later that night, Rutledge and Henderson went to a bar in Greenwood, Indiana, to play poker. While at the bar, Orr called Rutledge more than ten times. After playing poker, Rutledge and Henderson returned to Rutledge's home. At approximately 2:00 a.m., Tompkins called Rutledge using Orr's phone and began to argue with her, became "rude, loud, argumentative, and disrespectful," and stated "Oh, you think you're going to get my girlfriend. B, you can come get some, too. You can Google me . . . ." Transcript

2

at 213-214. The argument ended when Rutledge's phone died. Rutledge, Henderson, and Rutledge's daughter all fell asleep on a bed in Rutledge's bedroom.

At some point later during the night, Dorothy woke up to a loud beating coming from the entrance door to Rutledge's apartment, she then heard a "real loud kick of like a real loud bang," jumped up, went into the hallway, and observed Tompkins climbing the stairs with a knife in his hand. Id. at 255. Dorothy yelled at Tompkins, but he ignored her and went inside Rutledge's room. Dorothy followed Tompkins into the room and observed that Tompkins was over Rutledge and hitting her.

Rutledge woke up as Tompkins was on top of her and stabbing her. Rutledge recognized Tompkins based on the gray jogging suit, shoes, and braids. Henderson was awakened by Tompkins when he jumped, in "an aggressive move like a pounce," onto the bed, and Henderson pulled Rutledge's daughter off of the bed with her. Id. at 285. Henderson observed Tompkins run out of the room. Henderson and Dorothy called 911.

The police officer responding to the scene observed fresh signs of forced entry. An ambulance transported Rutledge to the hospital where it was determined that she had been stabbed five times, suffered nerve damage in her right hand, and one of her kidneys had been stabbed. While in the hospital, Orr called Rutledge and then Tompkins spoke to Rutledge on the phone. Tompkins stated that he did not stab Rutledge and offered her "money to let the police know that he did not do it." Id. at 225. Rutledge told Tompkins no and that he "could burn in hell." Id. Later, Rutledge and Henderson were both shown a photo array and both identified Tompkins as the perpetrator.

3

On January 4, 2011, the State charged Tompkins with Count I, burglary as a class A felony; County II, aggravated battery as a class B felony; and Count III, battery as a class D felony. On September 9, 2011, the State filed a notice of filing habitual offender, and the court granted the motion. On October 5, 2011, Tompkins filed a motion to exclude the testimony of Mary Orr because she failed to appear for depositions, and the court granted the motion. On October 13, 2011, the State moved to amend Count II to correct a scrivener's error, which the court granted. A jury trial began on October 17, 2011, but ended in a mistrial upon Tompkins's motion.

A second jury trial began on October 19, 2011. During trial, the court admitted, over Tompkins's objection, certain statements by Detective Andre Smith regarding his experience interviewing victims or witnesses. During closing arguments, the prosecutor made an argument related to the State's inability to present motive evidence, Tompkins objected, and the trial court admonished the jury. The jury found Tompkins guilty as charged under Counts I and II and not guilty under Count III. Tompkins admitted to being an habitual offender. The court vacated judgment of conviction under Count II due to double jeopardy concerns and sentenced Tompkins to twenty years in the Department of Correction for his conviction under Count I and enhanced the sentence by thirty years due to the habitual offender finding for an aggregate sentence of fifty years.

I.

The first issue is whether the retrial of Tompkins constituted a double jeopardy violation. Tompkins contends that his convictions should be reversed because the State forced a mistrial and should have been barred from retrying the case based upon double

4

jeopardy principles. The State argues that the prosecutor did not intentionally goad Tompkins into moving for a mistrial and that his double jeopardy rights were not violated.

Prior to the start of Tompkins's first trial on October 17, 2011, Tompkins verbally moved to exclude "Mary Orr, any testimony as to any statements she might [] have made." Transcript at 25. The State noted that at least one witness heard a voice that she recognized was Orr's voice and that would be admissible, and Tompkins agreed. The court granted Tompkins's motion to exclude the content of Orr's statements but not as to testimony from a witness that she heard Orr's voice.

During the first trial, the State asked Henderson if Tompkins was in the parking lot of the gas station, and Henderson responded: "I don't know if he was standing in the parking lot. I mean, he wasn't—I don't even think he expected us to be there. She was, like, panicked when she seen him." Id. at 105. The State asked "And that's Mary?" Id. Henderson responded: "Yes, Mary Orr. She had just went to the gas station and bought a bunch of stuff, drinks, food and everything, and left it in the car because she didn't want him to know that she had it." Id. Tompkins objected and stated that Henderson "started to talk about what Mary had said." Id. at 106. The court noted that Henderson was answering a question that was not asked and was volunteering information, and the court confirmed with the State that it had informed its witnesses of the court's rulings.

The State next called Rutledge as its witness, and the following exchange between the prosecutor and Rutledge occurred:

Q.    Did anybody call you while you were at the bar?

5

A.      Yes.

Q.      Who called you?

A.      Mary had called me and told me she was getting beat.

Id. at 174-175.  Tompkins objected and stated that he would be asking for a mistrial.

Outside the presence of the jury, the court listened to a recording of the foregoing exchange.  Tompkins's counsel asked Rutledge if the State had instructed her not to testify about anything Orr had said, and Rutledge responded "About what I heard or hearsay?"  Id. at 177.  Defense counsel stated "Hearsay.  Anything that Mary said to you, you weren't supposed to say."  Id.  Rutledge stated "Okay.  Well, no, I wasn't aware of that."  Id.  Defense counsel then stated "He didn't – the prosecutor didn't tell you that?"  Id.  Rutledge responded: "Yeah, he told me don't say what another person has said outside.  But she said it directly to me.  That's where it came to, to me."  Id. at 177-178. The prosecutor stated that Rutledge could have testified to a statement made by Orr to the extent that the statement was not hearsay or fell into an exception to the hearsay rule.

Tompkins moved for a mistrial and to be discharged.  The prosecutor argued that his understanding was that the motion in limine applied only to inadmissible hearsay, that he did not want Rutledge to make the statement which she made, and that his next question was going to relate to what question Orr had asked, which to his understanding would have been an admissible statement.  The prosecutor also argued that the question he had asked Rutledge was a "yes or no question."  Id. at 180.  The court stated:

> I will say this: I do not believe that it was the State's intention to have that witness say that.  That question did not call for it.  She went beyond what the answer would've called for.  You simply said, "Who called you?"

6

Her answer was, "Mary called me and told me she was getting beat."

Okay. So "Mary called me" would've been all that that question asked for.

Id. at 187. The court granted Tompkins's motion for mistrial. Tompkins's second jury trial began on October 19, 2011.

The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The Indiana Constitution, Article 1, § 14 provides: "No person shall be put in jeopardy twice for the same offense." These constitutional directives against double jeopardy are codified in Ind. Code § 35-41-4-3, which provides that:

> (a) A prosecution is barred if there was a former prosecution of the defendant based on the same facts and for commission of the same offense and if:
>
> > (1) the former prosecution resulted in acquittal or conviction of the defendant (A conviction of an included offense constitutes an acquittal of the greater offense, even if the conviction is subsequently set aside.); or
> >
> > (2) the former prosecution was terminated after the jury was impaneled and sworn or, in a trial by the court without a jury, after the first witness was sworn, unless (i) the defendant consented to the termination or waived, by motion to dismiss or otherwise, his right to object to the termination, (ii) it was physically impossible to proceed with the trial in conformity with law, (iii) there was a legal defect in the proceedings that would make any judgment entered upon a verdict reversible as a matter of law, (iv) prejudicial conduct, in or outside the courtroom, made it impossible to proceed with the trial without injustice to either the defendant or the state . . . .

7

(b)    If the prosecuting authority brought about any of the circumstances in subdivisions (a)(2)(i) through (a)(2)(vi) of this section, with the intent to cause termination of the trial, another prosecution is barred.

"The protection against double jeopardy will not prevent a retrial of the offense if: (1) a defendant waives his right to raise double jeopardy claims; (2) a defendant consents to the termination of proceedings after jeopardy has attached; or (3) the termination is required by manifest necessity." State v. Erlewein, 755 N.E.2d 700, 704 (Ind. Ct. App. 2001) (citation and internal quotation marks omitted). "[I]f a defendant moves for or consents to a mistrial, the defendant forfeits the right to raise a double jeopardy claim in subsequent proceedings unless the motion for mistrial was necessitated by governmental conduct 'intended to goad the defendant into moving for a mistrial.'" Id. (quoting Willoughby v. State, 660 N.E.2d 570, 576 (Ind. 1996)). To determine whether a second trial is barred after a defendant's motion for a mistrial, we must examine whether the prosecutor brought about the mistrial with the intent to cause termination of the trial. Willoughby, 660 N.E.2d at 576. If the State acted with intent to force the defendant into moving for a mistrial, the prohibition against double jeopardy bars a second prosecution. Id.

In this case, it was the State's witness, Rutledge, who introduced the comment which caused the mistrial. Rutledge's comment created the requisite prejudice necessary to terminate the first trial. While Tompkins urges us to find that Rutledge's entire response to the State's question constituted governmental conduct "intended to goad the defendant into moving for a mistrial," the trial court specifically found that it did not believe it was the State's intention for Rutledge to make the comment which resulted in a

8

mistrial and that the witness "went beyond what the answer would've called for." Transcript at 187. The prosecutor merely asked Rutledge who had called her, and Rutledge answered the question and went further by stating what Orr had stated. Tompkins does not point to the record to show that Rutledge colluded with the prosecutor to intentionally cause the mistrial or that Rutledge knew that her response was likely to cause a mistrial.

Based upon our review, we conclude that the record supports the trial court's conclusion that the prosecutor did not intend to force Tompkins to move for a mistrial, and accordingly Tompkins's second trial did not violate the constitutional or statutory proscriptions against double jeopardy. See Willoughby, 660 N.E.2d at 576 (noting that it was the State's witness who introduced the comment which caused the mistrial and created the requisite prejudice necessary to terminate the first trial, that the trial court specifically found that the State did not intentionally cause a mistrial, that the prosecutor merely asked its witness where a conversation took place, that the witness's answer was not a response the prosecutor likely anticipated, and that there was nothing in the record to suggest that the witness had colluded with the prosecutor to intentionally cause the mistrial, and holding that because the record supported the trial court's conclusion that the prosecutor did not intend to force the defendant to move for a mistrial, the defendant's second trial did not violate the constitutional or statutory proscriptions against double jeopardy). Accordingly, Tompkins is not entitled to reversal on this basis.

9

II.

The next issue is whether the trial court abused its discretion in admitting certain testimony. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001).

At trial, the State asked Detective Smith: "The first time you talk to an individual with a serious crime or serious incident, do they give you every single fact that happened?" Transcript at 357. Tompkins objected on the basis of relevance and that "[t]here hasn't been a foundation laid for this." Id. at 357-358. The court asked whether the question is in the detective's experience, the State responded affirmatively, and the court overruled Tompkins's objection. Detective Smith indicated that in his experience victims or witnesses of a crime do not always give the full account the first time that he spoke with them.

Tompkins argues that Detective Smith should not have been permitted, under Ind. Evidence Rules 701 and 702, to give an opinion that witnesses or victims of a crime often do not give a full account of the details the first time they are questioned. The State argues that Tompkins failed to preserve the issue for appeal because he challenges the admissibility of Detective Smith's testimony on appeal on different grounds from those raised at trial. The State further argues that Detective Smith's testimony was proper under Ind. Evidence Rule 701 or 702.

10

We observe, as argued by the State, that Tompkins failed to object to the admission of Detective Smith's testimony on the basis of Ind. Evidence Rules 701 and 702 at trial. "In order to preserve a claim of trial court error in the admission or exclusion of evidence, it is necessary at trial to state the objection together with the specific ground or grounds therefor at the time the evidence is first offered." Haycraft v. State, 760 N.E.2d 203, 212 (Ind. Ct. App. 2001) (citing Mullins v. State, 646 N.E.2d 40, 44 (Ind. 1995)), reh'g denied, trans. denied. Failure to do so results in waiver of our review of the issue on appeal. See id.

To the extent that Tompkins did preserve this issue for appeal, we note that Ind. Evidence Rule 701 provides, "[i]f the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." A skilled witness is a person with "a degree of knowledge short of that sufficient to be declared an expert under Rule 702, but somewhat beyond that possessed by the ordinary jurors." Mariscal v. State, 687 N.E.2d 378, 380 (Ind. Ct. App. 1997) (quotation omitted), reh'g denied, trans. denied. Smith testified that he had been a detective for ten years, that he had taken hundreds of statements of victims and witnesses, and that many times Smith had listened to those individuals talk about their statements again. Based upon the record, we cannot say that Detective Smith's testimony was not rationally based on his perceptions pursuant to Ind. Evidence Rule 701 or that the trial court abused its discretion in admitting his testimony. Further, we note that even if Detective Smith's testimony was

11

not rationally based on his perceptions, Tompkins fails to establish how this admission of evidence denied him a fair trial, and we will not reverse a trial court's admission of evidence absent a showing that such admission was a manifest abuse of discretion resulting in the denial of a fair trial.[1]  State v. Hunter, 898 N.E.2d 455, 457-458 (Ind. Ct. App. 2008).  Tompkins is not entitled to reversal on this basis.

III.

The next issue is whether the prosecutor committed prosecutorial misconduct that resulted in fundamental error.  During closing arguments, the prosecutor stated: "Defense tried to argue motive to you saying we hadn't produced a motive.  I wish we could.  There's some things we probably would like to put out there, but we couldn't."  Transcript at 426.

Tompkins argues that the State committed prosecutorial misconduct when it told the jury that evidence excluded by the court would have established a motive for the crime.  The State argues that the prosecutor's statements were made in direct response to Tompkins's remarks during his closing argument related to motive and that, even if the comment did constitute misconduct, it did not have any persuasive effect on the jury that would have placed Tompkins in grave peril.

In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected.  Cooper v. State, 854 N.E.2d

---

[1] Because we conclude Detective Smith's testimony is admissible under Ind. Evidence Rule 701, we need not determine whether his testimony would also be admissible under Ind. Evidence Rule 702.

831, 835 (Ind. 2006). Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. Id. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. Id.

When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. Id. If the party is not satisfied with the admonishment, then he or she should move for mistrial. Id. Failure to request an admonishment or to move for mistrial results in waiver. Id. Here, the record does not show that Tompkins requested a mistrial or was not satisfied with the court's admonishment, and thus Tompkins has waived the issue.

Where a claim of prosecutorial misconduct has not been properly preserved, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error. Id. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. Id. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." Id.

During Tompkins's closing arguments, defense counsel stated:

A motive, they don't have to prove a motive, they're asking you a reason for it. Not one of them gave you a reason why someone who friends [sic] with her would run up there and stab her over that little argument they had. It makes no sense at all. Nothing happened that was a big enough fight that he would run up there and stab her five times.

Transcript at 407. Later during the State's rebuttal arguments, the prosecutor stated: "Defense tried to argue motive to you saying we hadn't produced a motive. I wish we

13

could.  There's some things we probably would like to put out there, but we couldn't." Id. at 426.  Tompkins objected, and the court issued an admonishment to the jury stating that "[w]hat the lawyers are saying now is not evidence," that "[t]he lawyers can discuss the evidence, they can discuss the law and attempt to persuade you to a particular verdict," that "[y]ou can accept those arguments or you can reject them," and that "[i]n your deliberations in this case you must confine your deliberations solely to the evidence that was admitted in the trial and not consider any evidence or any reference to anything that was not admitted into evidence." Id. at 426-427.   The jury received instructions that statements made by the attorneys are not evidence; that final arguments are not evidence; that the attorneys are permitted to characterize the evidence, discuss the law and attempt to persuade the jury to a particular verdict, and that the jury may accept or reject those arguments as it sees fit; and that the jury's verdict should be based only on the evidence admitted and the instructions on the law.  Under the circumstances and in light of the evidence, we cannot say that Tompkins has demonstrated that the prosecutor committed misconduct or that any prosecutorial misconduct resulted in fundamental error.

For the foregoing reasons, we affirm Tompkins's conviction for burglary as a class A felony and his status as an habitual offender.

Affirmed.

BAKER, J., and KIRSCH, J., concur.

14